IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| RALPH MARCANO, | ) | |
| --- | --- | --- |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 07-CV-0234-MJR |
| | ) | |
| U.S. STEEL GRANITE CITY WORKS, | ) | |
| | ) | |
| Defendants. | ) | |

## **MEMORANDUM and ORDER**

**REAGAN, District Judge:**

### **A. Introduction and Background**

On April 3, 2007, Marcano filed the above-captioned action in this District Court alleging that his employer, United States Steel ("USS") engaged in racially discriminatory practices (Doc. 1). On March 12, 2008, having received permission to do so, Marcano filed an amended complaint alleging that USS's conduct violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*, and 42 U.S.C. § 1981 (Doc. 16).

Marcano, an African-American, alleges that he was disciplined on the basis of his race when he received various reprimands for making mistakes on the job, whereas white employees made similar mistakes but were not disciplined. Marcano also alleges that as a result of the reprimands, he was wrongfully demoted from his job as a Grade 4 Speed Finisher and reassigned for lower pay as a Grade 1 Laborer between 2005 and 2006.

USS produces steel products and employs Marcano as a speed finish operator. At the facility in question, USS employs three speed finish operators: Marcano and Wilbur Newby, who are both black, and Kenny Hahn, who is white (Exh. 67, Doc. 22, pp. 33-34). Each works a different shift.

In USS's facility, steel slabs undergo a process whereby they are charged and reheated in furnaces and are ultimately cooled with water so that they may be coiled. The speed finish operators ensure that operations in the finishing mill are properly adjusted. When settings are not properly adjusted, whether due to operator error, mechanical error, or electrical error, the steel strip may fail to enter the proper production area. When this occurs, the resulting product is known as a "cobble," and production must be shut down so the cobble can be removed and scrapped.

Because cobbles are very costly,[1] USS has a policy of taking disciplinary action when cobbles result from operator error. The level of discipline imposed is typically progressive, such that each subsequent error results in more severe discipline (*See* Exh. 67, Doc. 22, pp. 69, 87, 130-33). Such action may include warnings, suspensions, or even termination if repeated disciplinary action is required. Disciplinary action is not taken when errors are deemed to have been caused by machine or electric failure.

From January 17, 2004 through January 4, 2005, Marcano was disciplined numerous times for poor work performance due to cobbles allegedly resulting from his operator error.[2] He received a verbal warning on January 17, 2004 (Exh. 73; Exh. 74, p. 3), a written warning on April 8, 2004 (Exh. 74, p. 3; Exh. 76), and a one-day suspension on August 13, 2004 (Exh. 74, p. 3; Exh. 78). Marcano was cited in each of these instances for shutting down the finishing mills too early, as he failed to notice that steel bars were still coming in (Exh. 74, p. 3).

On December 10, 2004, Marcano's alleged failure to properly adjust various controls

---

[1] Marcano has indicated that a cobble may cost the plant up to $10,000 (Doc. 22, Exh. 67, p. 23).

[2] In addition to those listed here, Marcano received a three-day suspension on October 19, 2004. However, he later filed a grievance and won (Doc. 22, Exh. 67, p. 66).

affected the gauge of the steel and resulted in a cobble (Exh. 70, Doc. 25-3, p. 3). Marcano's supervisor Robert Fyalka stated that, at that time, he planned to move Marcano from the speed finishing job but after speaking with Marcano, Fyalka decided to give him another chance to correct the problem (Exh. 70, Doc. 25-3, p. 3; Exh. 82, Doc. 21-20). On January 4, 2005, another cobble occurred when Marcano failed to properly adjust the controls, though no discipline was immediately issued at that time (Exh. 70, Doc. 25-3, p. 3; Exh. 83).

In January 2005, USS held a meeting with Marcano and his union representative, Thomas Ryan. Management stated that they felt Marcano was becoming inattentive and that it was resulting in too many cobbles (Exh. 68, Doc. 23, pp. 42-43). As a result, management moved Marcano from the speed finishing job, which was a Grade 4 position, and temporarily reassigned him as a contour tester, a Grade 3 position, in order to help him regain his focus (Exh.67, Doc. 22, pp. 72, 97-98; Exh. 68, Doc. 23, pp. 42-43). At the time, Marcano believed he would not lose any reduction in pay, though Ryan believed that he would (Exh. 67, Doc. 22, pp. 58-59, 72, 95-97).

After a few weeks of training as a Grade 3 contour tester, Marcano refused to sign off on the position. Marcano feared that if he did so, USS would leave him there and would never put him back at the Grade 4 speed finisher position (Exh. 67, Doc. 22, pp. 108-10). Additionally, Marcano feared that USS was trying to keep him in a position with a high level of responsibility so that he could be fired upon his next mistake (Exh. 67, Doc. 22, p. 112; Exh. 68, Doc. 23, pp. 53-54). As a result, Marcano felt that he had to take a job as a laborer in a Grade 1 position in order to avoid being fired (Exh. 67, Doc. 22, pp. 112-14). While working at these lower grade positions, Marcano received a pay cut. However, Marcano eventually returned to his job as a Grade 4 speed finish operator on January 24, 2006 (Exh. 74).

Marcano does not deny that some of the cobbles were the result of his error. However,

he argues that he and other black employees have been regularly disciplined for such mistakes while white employees are rarely disciplined. As a result, he claims that USS has discriminated against him due to his race.

It appears that Marcano filed a completed Questionnaire with the United States Equal Employment Opportunity Commission ("EEOC") on March 7, 2005 (*See* Doc. 21-3, Exh. 25).[3] On February 7, 2006, Marcano filed a charge of discrimination with the EEOC (Doc. 21-5, Exh. 42), and the EEOC issued a right to sue letter on January 3, 2007 (Doc. 1-4, Exh. C). On April 3, 2007, Marcano instituted this action (Doc. 1).

On May 16, 2008, USS filed a motion for summary judgment, arguing that Marcano's Title VII claim is untimely and that in any case he cannot prove race discrimination under Title VII or § 1981 (Doc. 20). Marcano responded on June 12, 2008 (Doc. 29). USS submitted its reply on June 25, 2008 (Doc. 32).

Having fully reviewed the parties' filings, the Court hereby **GRANTS** USS's motion for summary judgment (Doc. 20).

### B. Standard of Review

Under **FEDERAL RULE OF CIVIL PROCEDURE 56**, summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." **FED. R. CIV. P. 56(c);** *Breneisen v. Motorola, Inc.*, **512 F.3d 972 (7th Cir. 2008) (citing** *Celotex Corp. V. Catrett*, **477 U.S. 317, 322-23 (1986), and** *Kreig v. Seybold*, **481 F.3d 512, 516 (7th**

---

[3] There is file-stamp on page one of the Questionnaire, which is faded but indicates that the document was received by the EEOC on March 7, 2005 (Doc. 21-3, Exh. 25). Marcano's signature on the form bears the date of March 4, 2005.

**Cir. 2007))**. *Accord Levy v. Minnesota Life Ins. Co.*, **517 F.3d 519 (7th Cir. 2008).**

In ruling on a summary judgment motion, this Court must view the evidence and all inferences reasonably drawn from the evidence in the light most favorable to the non-moving party. *TAS Distributing Co., Inc. v. Cummins Engine Co.*, **491 F.3d 625, 630 (7th Cir. 2007);** *Reynolds v. Jamison*, **488 F.3d 756, 764 (7th Cir. 2007).**

The mere existence of an alleged factual dispute is not sufficient to defeat a summary judgment motion. *Anderson v. Liberty Lobby*, **477 U.S. 242, 247 (1986);** *Salvadori v. Franklin Sch. Dist.*, **293 F.3d 989, 996 (7th Cir. 2002).** Rather, to successfully oppose summary judgment, the non-movant must present definite, competent evidence in rebuttal. *Vukadinovich v. Board of Sch. Trs. of N. Newton Sch. Corp.*, **278 F.3d 693, 699 (7th Cir. 2002)**. Nonetheless, a non-moving party may submit excerpts of his own deposition as "affirmative evidence to defeat summary judgment," *Williams v. Seniff*, **342 F.3d 774, 785 (7th Cir. 2003)**, and a plaintiff may present an affidavit relating facts of which he has personal knowledge to support a discrimination claim. *Volovsek v. Wisc. Dep't of Agriculture, Trade and Consumer Protection,* **344 F.3d 680, 690 (7th Cir. 2003).**

### C. Analysis

#### 1. Statute of Limitations

First, USS argues that Marcano's Title VII claims are time-barred. A claim that the plaintiff failed to timely file a charge of discrimination with the EEOC is an affirmative defense. *Salas v. Wisc. Dep't of Corrections*, **493 F.3d 913, 921 (7th Cir. 2007).** Accordingly, USS bears the burden of proof on this issue. *Id.*

Though it is not clear whether Marcano ever initially instituted his proceedings in a state or local agency, the parties agree that Marcano had 300 days from the date of the alleged unlawful employment practice in which to file a charge of discrimination with the EEOC. **42 U.S.C.**

**§ 2000e-5(e)(1)**. However, the parties do not agree on when Marcano actually filed a charge within the meaning of the statute. Marcano argues that his March 7, 2005 Questionnaire satisfies the filing requirement (Doc. 21-3, Exh. 25), whereas USS argues that Marcano's February 7, 2006 filing of a charge of discrimination is the relevant filing (Doc. 21-4, Exh. 42).

As noted above, Marcano was moved from a Grade 4 position to a Grade 3 position on January 11, 2005 and then moved to a Grade 1 position on April 5, 2005 (Exh. 74, Doc. 21-12, p. 2). If Marcano's Questionnaire satisfied the filing requirement, then it was clearly within the 300-day time limit as to all dates in question. However, if the actual charge of discrimination is the relevant filing under the statute of limitations, any events occurring prior to April 13, 2005 are time-barred, as that date is 300 days prior to Marcano's filing. And as all of Marcano's allegations of discrete discriminatory actions occurred prior to that date, Marcano's Title VII claims will be deemed time-barred unless the Questionnaire constitutes a sufficient filing under **§ 2000e-5(e)(1)**.

The question, then, is whether Marcano's Questionnaire is a sufficient "charge" under the statute. **29 C.F.R. § 1601.12(a)(3)** provides that a charge should contain "[a] clear and concise statement of the facts, including pertinent dates, constituting the alleged unlawful employment practices." However, **§ 1601.12(b)** provides that a filing can still constitute a charge if it is "sufficiently precise to identify the parties, and to describe generally the action or practices complained of."

USS argues that "[t]he questionnaire cannot constitute a 'charge' because it did not describe the alleged discriminatory practices as required by the EEOC Procedural Regulations . . . Marcano left that section blank" (Doc. 32, p. 5). USS refers to page two of the Questionnaire, which provides: "In your own words, describe what happened to you that you believe to be discriminatory (use an additional sheet if necessary)." Marcano did not write anything in this area (Exh. 25, Doc. 21-

-6-

3).

Nonetheless, USS ignores the fact that throughout the Questionnaire, Marcano did include enough factual background to sufficiently identify the relevant parties and general practices complained of. He alleged that USS managers, including Larry Welch and Tim Baker, were planning to move him to another job even though his mistakes were only minor (Exh. 25, p. 3) and that he was written up every time he made such a mistake (Exh. 25, p. 4). Marcano included these allegations under the pertinent headings to indicate that he believed the actions being taken were the result of racial discrimination.

In light of this, the Court finds that USS has not carried its burden of proof in showing that the Marcano failed to timely file a charge. Accordingly, the Court must reject USS's argument that Marcano's Title VII claims should be dismissed as untimely.

**2. Marcano's Race Discrimination Claims**

Title VII forbids employers "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of" his race. ***Little v. Illinois Dept. of Revenue,* 369 F.3d 1007, 1011 (7th Cir. 2004); 42 U.S.C. § 2000e-2(a)(1) (2000)**. Additionally, § 1981 provides that "all persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens."

Though Title VII and § 1981 address different types of discrimination, a plaintiff proceeding under either must satisfy the same prima facie requirements. ***Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 538 (7th Cir. 2007) ("We generally have applied the same prima facie requirements to both Title VII and § 1981.")**. The plaintiff may either (a) provide direct evidence of an employer's discriminatory intent, or (b) show disparate treatment using the indirect, burden-

shifting method established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). *See Contreras v. Suncast Corp.*, 237 F.3d 756, 759 (7th Cir.), *cert. denied*, 534 U.S. 824 (2001).

Because Marcano has presented no direct evidence of race discrimination, the Court turns to the indirect, burden-shifting method. To prevail under the indirect approach, the plaintiff first must establish a prima facie case of discrimination, which requires him to prove (1) that he is a member of a protected class, (2) that he was meeting the employer's legitimate expectations, (3) that he suffered an adverse employment action, and (4) other similarly-situated employees who were not members of the protected class were treated more favorably. *Wells v. Unisource Worldwide, Inc.*, 289 F.3d 1001, 1006 (7th Cir. 2002) (citing *Paluck v. Goodling Rubber Co.*, 221 F.3d 1003, 1012 (7th Cir. 2000)). The Seventh Circuit has repeatedly stressed that a plaintiff must establish, not merely incant, each of these elements. *Grayson*, 308 F.3d at 818; *Wells*, 289 F.3d at 1006; *Coco v. Elmwood Care, Inc.*, 128 F.3d 1177, 1179 (7th Cir. 1997).

If the plaintiff is able to make this prima facie showing of discrimination, the burden shifts to the defendant/employer to articulate a legitimate, non-discriminatory reason for its decision. *Id.* If the employer does so, it rebuts the presumption of discrimination and shifts back to the plaintiff/employee the burden of showing that the employer's proffered reason was pretextual. *McDonnell Douglas*, 411 U.S. at 802; *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692-93 (7th Cir. 2000).

Having fully reviewed the record, the Court finds that Marcano fails to present a genuine issue of material fact with respect to two elements of the prima facie case, and summary judgement must be entered in favor of USS.

### a. The Legitimate Expectations of Marcano's Employer

First, USS argues that Marcano failed to meet the legitimate expectations of his

employer. As explained above, Marcano was disciplined on multiple occasions for poor work performance when he shut down the finishing mill prematurely, while other steel bars were still coming down. Marcano's supervisor, Robert Fyalka, has also stated that Marcano committed other errors on December 10, 2004 and January 4, 2005 that resulted in cobbles, but instead of disciplining Marcano, the decision was made to temporarily move him to another job (Exh. 70, Doc. 25-3, p. 3). Aside from an incident on October 19, 2004, Marcano does not dispute that he was responsible for the mistakes (*See* Exh. 67, Doc. 22, pp. 62-67, 112-13). Moreover, Marcano admits that cobbles can cost USS up to $10,000 each (Exh. 67, Doc. 22, p. 23).

Marcano attempts to show that he was meeting the legitimate expectations of his employer by arguing that white employees made similar mistakes but were not disciplined. ***See Crawford v. Indiana Harbor Belt R.R. Co., 461 F.3d 844, 845 (7th Cir. 2006).*** However, there are a number of problems with Marcano's assertion. He admits that cobbles regularly occur as a result of machine error (Exh. 67, Doc. 22, pp. 23-24, 94-95, 175). Whether a cobble is due to the operator or a machine error is a "judgment call" (Exh. 69, Doc. 24, pp. 59-60). Marcano claims that this permits the supervisors to protect white employees by writing up a report that blames the cobble on equipment error rather than blaming the worker (Exh. 67, Doc. 22, pp. 133-37). However, Marcano presents little direct evidence that this actually happens, relying instead on second-hand accounts and hearsay. For instance, Marcano discusses cobbles he believes Kenny Hahn caused, but admits that he does not work on the same shift (Exh. 67, Doc. 22, pp. 33-34). As a result, it is clear that Marcano learned this information second-hand. Additionally, when asked how he knows whether other employees receive disciplinary action, Marcano admits that the information comes only from what others tell him: "If something going on, Newby going to let me know. People just come back and tell me things because they don't like the way the company did me. They say, you have these other guys making mistakes,

they didn't get wrote up for this or they didn't get wrote up for that . . . ." (Exh. 67, Doc. 22, p. 145).

Wilbur Newby also explains that the information he has about other employees comes second-hand. For instance, Newby repeatedly states that various employees caused cobbles, but supervisors blamed the errors on equipment failure so that the worker would not be punished (Exh. 69, Doc. 24, p. 40-44, 55-56). However, he admits that he was not present for many of these cobbles, including those Kenny Hahn was allegedly responsible for (Exh. 69, Doc. 24, pp. 44, 61, 65). He also agreed that an employee only knows whether a reprimand is issued if he hears other employees talk about it (Exh. 69, Doc. 24, p. 56). When pressed on this issue, Newby acknowledges: "I don't know what the company does other than what they do to me. Everything else is just hearsay unless somebody takes and produces something to me and say, 'This is what happened. This is what the company do to me'" (Exh. 69, Doc. 24, p. 79).

As a result, this evidence is inadmissible hearsay, and cannot be used to create a genuine issue of material fact. ***See Schindler v. Seiler*, 474 F.3d 1008, 1010 (7th Cir. 2007) ("In order to defeat a motion for summary judgment, a plaintiff must present admissible evidence that raises a genuine issue of material fact.").**

Marcano and Newby do indicate that they have direct knowledge of some employee misconduct. For instance, Marcano and Newby provide first-hand accounts of others sleeping on the job (Exh. 67, Doc. 22, pp. 45-49, 52-58; Exh. 69, Doc. 24, pp. 71-78; *see* Exh. 11, Doc. 29-2). Marcano also provides photographs of co-workers who appear to be sleeping and claims that supervisors witnessed such misconduct but did not verbally reprimand the individuals (Exh. 11, Doc. 29-2; Exh. 67, Doc. 22, pp. 55-56; *see* Exh. 69, Doc. 24, pp. 76-78, 80).

Even construing the facts in favor of plaintiff, Marcano still does not satisfy his burden of showing that he was meeting the legitimate expectations of his employer. Marcano's argument is

essentially that he was repeatedly disciplined for causing cobbles, while white employees were not disciplined for similar errors. However, misconduct such as sleeping is not comparable to Marcano's supposed misconduct, as Marcano admits that each cobble could cost the company $10,000. He offers no support for the implication that sleeping on the job is as harmful to the company as causing cobbles, or that sleeping would warrant a similar level of discipline. While one would expect discipline in either circumstance, the alleged disparity in treatment with respect to causing cobbles versus sleeping on the job does not carry Marcano's argument that he was meeting legitimate expectations over the threshold.

Marcano also claims that he has firsthand knowledge of at least some cobbles caused by employee error, as does Newby. But as noted above, Marcano and Newby only claim that they know about the issuance of discipline (or lack thereof) if their co-workers openly talk about it (*See* Exh. 69, Doc. 24, p. 56). Thus, Marcano merely speculates that no reprimand was ever issued and only supports his contentions with inadmissible hearsay. Such evidence is not sufficient to indicate the existence of a genuine issue of material fact.

Moreover, USS rebuts many of Marcano's specific claims that employees were not disciplined for causing cobbles. For example, Marcano claims that soon after he was removed from his job as a speed finisher in January 2005, Kenneth Werths "pushed a slab off" and no discipline was rendered (Exh. 71, Doc. 21-9, p. 3). USS, however, presents unchallenged evidence that Werths was in fact verbally warned about poor work performance after causing a cobble on February 12, 2005 (Exh. 85, Doc. 21-24). Supervisor Robert Fyalka stated that disciple was not more severe because Werths had no prior citations (Exh. 70, Doc. 25-3, ¶ 7(a)).[4]

---

[4] Similarly, Marcano also received a verbal warning rather than formal discipline on January 17, 2004—the first of the incidents in the record (Exh. 70, Doc. 25-3, ¶ 4(a)).

Additionally, Marcano claims that Kenny Hahn was responsible for a cobble on December 6, 2005, and no discipline was rendered (Exh. 71, Doc. 21-9, p. 3). However, USS presents unrebutted evidence that Hahn was in fact given a verbal warning on December 7, 2005, as it was his first incident (Exh. 86, Doc. 21-25; Exh. 70, Doc. 25-3, ¶ 7(b)). Marcano does not dispute that supervisors did in fact talk to Hahn about his error (Exh. 67, Doc. 22, pp. 162-63).

Marcano claims that Christopher Heintz damaged numerous coils in December of 2005 (Exh. 71, Doc. 21-9, p. 4). The record shows that both Heintz and Dave Klein were given five-day suspensions subject to discharge due to the severity of the occurrence (Exh. 70, Doc. 25-3, ¶¶ 7(a), (e)). Marcano complains that neither was actually required to serve the suspension. However, he was not working as a speed finisher at the time, such that it is not clear whether he would have been personally aware of their absence had the suspension been served. In any event, he provides no direct to support this claim.

Marcano also alleges that Jeff Cobine, Dave Klein, and others were not disciplined for their misconduct (Exh. 71, Doc. 21-9, p. 4). But even where it appears that these employees may not have been disciplined for the particular infractions Marcano alleges, USS provides records showing that these employees were disciplined for a number of errors and misconduct on the job (Exh. 93, Doc. 21-31; Exh. 95, Doc. 21-33; Exh. 70, Doc. 25-3).

In short, Marcano's claim that white employees were not disciplined for causing cobbles, even where he recalls particular dates, is contradicted by the evidence. Marcano has not provided evidence of any white employee who went undisciplined after causing as many cobbles as he admittedly did. Moreover, Marcano admits that cobbles cost the company many thousands of dollars. Thus, Marcano fails to present competent evidence to indicate that he was fulfilling his employer's legitimate expectations.

### b.  The Treatment of Similarly Situated Employees

Even if Marcano could show that other employees were not disciplined for their errors, he fails to clear another hurdle in his prima facie case.  Marcano has not provided admissible evidence to show that similarly-situated employees who were not members of the protected class were treated more favorably.  Generally, the "similarly situated" requirement requires a showing that "the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them."  **Humphries v. CBOCS West, Inc., 474 F.3d 387, 404-05 (7th Cir. 2007).**  This standard is flexible and requires consideration of "all relevant factors, the number of which depends on the context of the case."  *Id.* **at 405.**  In other words, the plaintiff need only show sufficient similarity—he need not show that he is identical to the other employee.  "[T]he inquiry simply asks whether there are sufficient commonalities on the key variables between the plaintiff and the would-be comparator to allow the type of comparison that, taken together with the other prima facie evidence, would allow a jury to reach an inference of discrimination or retaliation."  *Id.*

Marcano states that there are only two others working as Grade 4 speed finish operators: Wilbur Newby and Kenny Hahn (Exh. 67, Doc. 22, pp. 32-34).  Newby and Marcano are black, and Hahn is white (Exh. 67, Doc. 22, p. 34).  None of the other individuals cited by Marcano as having received special treatment on account of their race are Grade 4 speed finish operators (Exh. 70, Doc. 21-8, ¶ 7).  Rather, each is employed at a different grade and position (*See* Exh. 70, Doc. 25-3, ¶ 7).  As such, other than Newby and Hahn, the employees Marcano focuses on do not have the same work responsibilities as he did, and it is not clear that they report to the same supervisors as Marcano.

Under USS's Basic Labor Agreement, Grade 4 Operating Technicians perform the following tasks:

> Operates and is responsible for a significant producing unit . . . or operates and assists Senior Operating Technician on a major producing unit as a member of the operating team. Directs other operating and support crew members, performs administrative duties, and communicates with maintenance, as required to maximize production. Performs and assists in production and maintenance tasks and functions necessary to assure maximum production, quality and inspection. Performs or leads maintenance activities as required with operating crew members and coordinates and works in conjunction with Maintenance Technicians. Includes hybrid operating/maintenance jobs such as former Equipment Tender.

(Exh. 8, Doc. 25-2, p. 184). In short, employees in Marcano, Newby, and Hahn's position have more responsibility than technicians at Grades 1, 2, or 3 (Exh. 67, Doc. 22, pp. 37-39). The difference between the various positions is also clear from the fact that when trained as a Grade 3 Technician, Marcano stated that it would take at least six weeks to become familiarized with the position, and that in order to become efficient it could take six months to a year (Exh. 68, Doc. 22, pp. 84-85, 108-09). Additionally, Marcano states that a great deal of responsibility is given to those at Grade 4 and agreed with the proposition that "[t]he buck kind of stops with the speed finisher . . . ." (Exh. 67, Doc. 22, p. 133). As a result, it is clear that there is substantial difference between operators and technicians at Grade 4 as opposed to those at Grade 3. As such, this Court cannot find that employees such as Kenneth Werths, Christopher Heintz, Daniel Klaus, or Jeff Cobine were "similarly situated" to Marcano.

Marcano has, however, sufficiently shown that he shares the same job responsibilities and general duties as Hahn and Newby, even if they work on different shifts and may not always work under the same supervisors. But Marcano has not made a prima facie showing that Hahn, the only similarly situated employee who is white, was treated more favorably than Marcano. As explained

above, Marcano and Newby's allegations about the large number of cobbles caused by Hahn is based on hearsay, as neither works on the same shift as Hahn (*See* Exh. 67, Doc. 22, pp. 33-34; Exh. 69, Doc. 24, pp. 44, 61, 65). Marcano has produced no evidence or statements from anyone with first-hand knowledge of any incident for which Hahn was directly responsible and received no disciplinary action.

Additionally, Marcano and Newby admit that their knowledge of whether other employees, including Hahn, were reprimanded for misconduct is based on what they heard from their co-workers (Exh. 67, Doc. 22, p. 145; Exh. 69, Doc. 24, p. 56). Such evidence is inadmissible hearsay and cannot be used to create a genuine issue of material fact.

Also, with respect to Marcano's specific allegation that Kenny Hahn was responsible for a cobble on December 6, 2005 (Exh. 71, Doc. 21-9, p. 3), USS has provided undisputed evidence that Hahn was in fact given a verbal warning on December 7, 2005, as it was his first incident (Exh. 86, Doc. 21-25; Exh. 70, Doc. 25-3, ¶ 7(b)). Marcano himself recognizes that a verbal warning was given (Exh. 67, Doc. 22, pp. 162-63), and the evidence indicates that a verbal warning is the typical action taken with employees upon their first cobble (*See* Exh. 67, Doc. 22, pp. 69, 87, 130-33). Other allegations that Hahn has been responsible for various cobbles are speculative and conclusory in nature and are unsupported by personal knowledge or other competent evidence (*See* Exh. 67, Doc. 22, pp. 133-34).

Moreover, Marcano explains that a primary reason that managers blame cobbles on mechanical errors rather than blaming a co-worker is to protect their fellow union workers (Exh. 67, Doc. 22, pp. 134, 136-37). In other words, according to Marcano, such actions are not typically racially motivated, but rather are motivated by union membership.

Newby's testimony similarly alleges that Hahn was not reprimanded for cobbles he

caused, though Newby admits that he did not personally observe the cobbles and that any information regarding discipline or lack thereof only comes second-hand. For instance, Newby alleges that Hahn had "roughly three times as many" cobbles as Newby had, but was never disciplined (Exh. 69, Doc. 24, pp. 55-56). When asked how he knows this, Newby explains

> Normally when a reprimand is issued in the steel industry, somebody tells somebody, "Hey I got a reprimand, this, this, and this." Plus the way in which the cobble report is written up, you have some assistant rollers can write a cobble report up to where it wasn't the operator's fault. It could have been caus X, X, and X, happened which caused the cobble.

(Exh. 69, Doc. 24, p. 56). Newby also admits that his information with respect to Hahn's performance comes from what others tell him (Exh. 69, Doc. 24, p. 57). Furthermore, Newby states that while he has seen some of Hahn's cobble reports, the cause of an error is always a judgment call (Exh. 69, Doc. 24, p. 59-60). And though Newby says that he reviewed some videos where he believed Hahn could have avoided cobbles, he admits that he has not actually been present for any of Hahn's cobbles (Exh. 69, Doc. 24, p. 61).

Thus, even construing the evidence in the light most favorable to Marcano, the Court must find that he has failed to show that there is a genuine issue of material fact as to whether similarly situated white employees were treated more favorably than he was.

Having determined that Marcano has failed to present a genuine issue of material fact with respect to two of the four elements of his prima facie case, the Court need not address any of the other arguments raised by the parties. In short, Marcano has not produced any admissible evidence to show that he fulfilled his employer's legitimate expectations or that he is similarly situated to a white employee who was treated more favorably. As a result, summary judgment must be granted in favor of USS.

### D. Conclusion

Accordingly, the Court hereby **GRANTS** U.S. Steel's motion for summary judgment (Doc. 20). As this case is now closed, the Court **CANCELS** all settings herein, including the September 5, 2008 Final Pre-Trial Conference and the September 22, 2008 Jury Trial.

**IT IS SO ORDERED.**

**DATED this 21st day of August 2008.**

<u>s/ Michael J. Reagan</u>
**MICHAEL J. REAGAN**
**United States District Judge**